Jose Abelardo Calmet COUZADO, Jean Dennis Boileau, Claude Woodhull and Donna Woodhull, his wife, Salvador Moran Keydel, Leonardo Moran Auyon, and Alcides Diaz, Plaintiffs,

v.

UNITED STATES of America, et al., Defendant.

No. 92–1135–CIV.

United States District Court, S.D. Florida.

March 16, 1995.

Arthur Tifford, Miami, FL, for plaintiffs Calmet Couzado and Jean Dennis Boileau.

Steven Kellough, Miami, FL, for plaintiffs Claude and Donna Woodhull.

Joel Fass, Fort Lauderdale, FL, for plaintiffs Moran Keydel, Moran Auyon and Diaz.

Cynthia Ann Everett, Miami, FL, for U.S.

## AMENDED ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

MORENO, District Judge.

THIS MATTER comes before the Court upon Defendant UNITED STATES OF AMERICA'S Motion for Judgment as a Matter of Law claiming that the Court lacks jurisdiction in this Federal Tort Claims Act ("FTCA") suit. The Court holds that the Government's failure to follow its own mandatory policies requiring notification to the United States Chief of Mission or his delegated representative in a foreign country when conducting a controlled drug delivery in that foreign nation was not a decision that falls within the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a) (1948). Therefore, the Court has jurisdiction over this matter, denies Defendant's Motion for Judgment as a Matter of Law and finds that the Government is liable for the damages that the crew and passengers of Belize Air International, Ltd. ("Belize Air") flight # 712 suffered in Honduras as a result of the Government's participation in a covert sting operation.

## I. Background

On April 3, 1991, United States Customs ("Customs") became involved in the investigation of a cocaine trafficking scheme through points in Central America and Miami, Florida. The United States Embassy in Belize contacted Customs in Miami, and in concert with the Belizean National Police, arranged for a controlled delivery of cocaine using Belize Air flight # 712. Two boxes containing 45 kilograms of cocaine was to be loaded in Belize and delivered to Miami with the hope of apprehending its recipients. Customs service agents had initially participated in the investigation, which was eventually conducted by agents of the Drug Enforcement Administration ("DEA"). The DEA denied Customs' request of a foreign country clearance, which would have allowed Customs Special Agent Alan L. Childers and Group Supervisor Peter G. Girard to continue their lead role in the investigation. Upon this denial of foreign country clearance, Customs and the DEA ceased cooperating with one another and, consequently, vital information concerning the logistics of the operation was not communicated. No agent of Customs or the DEA informed the crew or the passengers of flight # 712 that a controlled delivery of cocaine was being conducted on their flight. More importantly, no agent of Customs or the DEA notified any authorities in Honduras, a stopover on the Belize Air flight, of the existence of the covert sting operation.

On April 6, 1991, flight # 712 departed Miami and arrived in Belize where the Belize National Police, with the cooperation of the DEA Central American office, loaded the plane with 45 kilograms of cocaine. The plane then left for San Pedro Sula, Honduras. Upon its arrival, drug sniffing dogs sounded the alert that led to a search of the plane and the discovery of the cocaine by Honduran authorities. The three crew members and two passengers were arrested and ultimately spent 11 days in jail in Honduras before being released. A third passenger, of Honduran birth, was arrested three days later and spent eight days in jail. The crew and passengers brought suit against the United States, Belize Air International, Ltd.

and its Chief of Security, Paul Martin. Plaintiffs obtained a default judgment against Belize Air International, Ltd. and dismissed all claims against Paul Martin. A non-jury trial on all counts against the United States followed, which resulted in a judgment in favor of Plaintiffs on the negligence counts and in favor of the Government on all other counts.

## II. The Discretionary Function Exception to the Federal Tort Claims Act

Defendant argues that this Court lacks jurisdiction over this matter because its actions fall within the purview of the discretionary function exception to the FTCA. While the FTCA is generally a broad waiver of sovereign immunity, there are certain exceptions where immunity still attaches. The Government is not liable for

> any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). Thus, where the Government's actions are discretionary in nature, there is no liability.

■ The Supreme Court has yet to definitively outline what constitutes a discretionary function under the FTCA. However, the Court has set forth a two-part test to guide the lower courts. The initial inquiry is whether the act involved was discretionary in nature. The Supreme Court has found that, "[w]here there is room for judgment and decision there is discretion." *Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953). Thus, in order for the discretionary function exception to apply, some element of choice must be involved. "The discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). In such a situation, "the employee has no rightful option but to adhere to the directive." *Id.*

Even assuming the challenged conduct involves some element of judgment, however, the second prong of the two-part test requires an additional inquiry. Where an element of choice or judgment is implicated a court "must determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* The purpose of the discretionary function exception was to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984).

In the Supreme Court's most recent opinion on the subject, it found that some discretionary acts are not protected by the discretionary function exception.

> There are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish. If one of the officials involved in this case drove his automobile on a mission connected with his official duties and negligently collided with another car, the exception would not apply. Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.

*United States v. Gaubert,* 499 U.S. 315, 325 n. 7, 111 S.Ct. 1267, 1275 n. 7, 113 L.Ed.2d 335 (1991). In *Gaubert,* the Court found that federal regulators' negligent supervision of a savings and loan association's day-to-day operations involved an exercise of discretion in furtherance of the FTCA's public policy goals and was therefore immune from liability. The Court in *Gaubert* also found that where a regulation mandates particular conduct and the Government employee violates this mandatory regulation, "there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Id.* at 324, 111 S.Ct. at 1274.

The Eleventh Circuit recently visited the discretionary function exception issue. In *Autery v. United States*, 992 F.2d 1523 (11th Cir.1993), Judge Phyllis A. Kravitch found that decisions made by national park personnel in designing and implementing its unwritten tree inspection program fell within the discretionary function exception to the FTCA. In focusing on the discretionary function exception, the Court stated that "the relevant inquiry ... is whether controlling statutes, regulations and administrative policies mandated that the Park Service inspect for hazardous trees in a specific manner." *Id.* at 1528. The Court went on to note that the "unwritten policy required only that employees 'make every effort within the constraints of budget, manpower, and equipment available to recognize and report' hazardous trees." *Id.* This requirement did not sufficiently embody a "fixed or readily ascertainable standard" which specifically prescribed a specific course of conduct. *Id.* at 1529. Accordingly, the Court concluded that the discretionary function exception to the FTCA was applicable and the Government was immune from liability.

It is clear that criminal law enforcement decisions, while generally discretionary in nature, are still subject to the two-part test set forth by the Supreme Court in *Dalehite, Berkovitz* and *Gaubert. See, e.g., Mesa v. United States*, 837 F.Supp. 1210 (S.D.Fla. 1993). The Court must subject the facts of this case to the two-part test.

### III. The Discretionary Function Exception As Applied To The Instant Case

 The United States Government, through Customs, the DEA, the U.S. Embassy in Belize and in concert with the Belize National Police, conducted a joint venture using Belize Air flight # 712.[1] The Government's decision to conduct a covert sting operation via a controlled delivery of cocaine is, without question, a discretionary decision which is immune from judicial second-guessing. Thus, the United States cannot be liable for initiating the events that ultimately led to the present lawsuit. However, the Government was not without certain obligations that mandated specific action. Most importantly, there was no discretion on the part of the Government agencies involved, Customs and DEA, not to notify the Chief of the U.S. Mission in the countries in which the Belize Air flight would be arriving.

This policy requirement was explicitly stated by one of the Government's own witnesses at trial, Ambassador Cresencio Arcos, the former United States Ambassador to Honduras during the time this cause of action arose. Ambassador Arcos testified that either Customs or the DEA was required to notify him of the planned operation based upon the Letter of Instruction issued to all U.S. Ambassadors by the President of the United States. This requirement is found in the Letter of Instruction, which states that "[the Ambassador] should instruct all Executive branch personnel under [the Ambassador's] authority of their responsibility to keep [the Ambassador] fully informed at all times of their current and planned activities ..." (Def.'s Trial Ex. 9 at App. 1). The Letter further states that the Ambassador is charged with the "full responsibility for the direction, coordination, and supervision of all executive branch U.S. Offices and personnel in the [country of assignment]." *Id.* Ambassador Arcos testified that all personnel subject to his authority were aware of the fact that he must be kept informed of their activities in Honduras. He further testified that this policy was not followed in this case and that he should have been informed of the operation prior to the Belize Air flight's arrival.

Furthermore, pursuant to Chapter 65 of the Guidelines for DEA Foreign Activities, Subsection E, Inter–Agency Responsibilities (Pls.' Trial Ex. 12 at App. 2), DEA represen-

---

**1.** The Court notes that a sufficient nexus existed between Government officials in the United States and its officers and agents in Belize such that the foreign country exception to the FTCA does not apply. 28 U.S.C. § 2680(k) (1948). The foreign country exception precludes recovery for any claim arising in a foreign country. How-

ever, in the instant case, the participation of both Customs and the DEA, the eventual goal of recovering the cocaine in the United States, and the numerous phone conversations conducted in the United States, render the foreign country exception inapplicable.

tatives were required to coordinate with the Embassy Narcotics Coordinator all sensitive or unusual DEA activities conducted in-country. Paul Higdon, DEA's Deputy Assistant Administrator for Foreign Operations, testified at trial that it was DEA policy to keep U.S. Ambassadors informed of drug operations in host countries. These were express mandates, prescribing a specific course of conduct, that were not followed in the instant case.

Because the Government agents knew that the flight plan of Belize Air flight #712 included stops in Honduras and Guatemala prior to its final destination in Miami, they were required to notify the U.S. Embassies in those countries. No judgment or element of choice was involved in the failure by Agent Larry Hollifield, the DEA agent in charge of the operation, to notify the U.S. Ambassador or the DEA Country attaché in Honduras. Furthermore, failure to coordinate the operation with the Honduran Embassy's Narcotics coordinator or to keep Ambassador Arcos, or his representative, informed of the operation as required by Chapter 65 of the DEA Guidelines for Foreign Operations also did not involve any element of choice.

■ The DEA Guidelines and the Letter of Instruction from the White House to U.S. Ambassadors specifically prescribed a course of action that Government agencies and their agents were required to follow. The agencies and their agents had no rightful option but to adhere to these mandates. Therefore, the Government's failure to comply with these requirements makes the discretionary function exception to the FTCA inapplicable. To rule that the actions taken by the United States in this case are exempt from liability based on the discretionary function exception to the FTCA would attach blanket immunity for *all* governmental actions in criminal law enforcement situations. This was clearly not Congress' intent when it created the discretionary function exception to the FTCA.

In conclusion, in awarding Plaintiffs monetary damages based upon the claim of negligence, it can be said that the United States had a duty to comply with certain administrative and Executive guidelines and instructions that were created to govern the operations of the United States in foreign countries. The United States breached this duty by failing to inform the Chief of Mission in Honduras of the covert sting operation as it pertained to that country and by failing to comply with the DEA Guidelines governing foreign relations. This breach was the proximate cause of the events that led to the arrest, detention, torture and brutalization of the Plaintiffs while incarcerated. Plaintiffs suffered damages based upon the United States' breach of its duty.

The United States relies upon Judge Marcus' opinion in *Mesa v. United States,* 837 F.Supp. 1210 (S.D.Fla.1993) for the proposition that the decision to participate in a controlled delivery, as well as the means used to carry it out, is a discretionary function as a matter of law and is excepted from the FTCA. However, this reading of *Mesa* is too broad. In *Mesa,* an arrestee claimed that DEA agents were negligent in their investigation and erroneous execution of an arrest warrant. The Court, quoting *Smith v. United States,* 375 F.2d 243 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967), found that the discretionary function exception of the FTCA "exempts the government from liability for exercising discretion inherent in the prosecutorial function of the Attorney General, no matter whether these decisions are made during the investigation or prosecution of offenses." *Mesa,* 837 F.Supp. at 1214.

This Court clearly agrees that almost all law enforcement decisions are discretionary in nature. The question of when and how to execute a search warrant, such as was involved in *Mesa,* is a "quintessential" discretionary function. Thus, if the question before the Court was whether the United States should have participated at all in a covert sting operation, or when and where to conduct the controlled delivery, this Court would have to find that it is a discretionary question exempt from judicial second-guessing. However, that is not the question presented by the facts of this trial. The issue here is whether the Government has discretion to not adhere to the standards and mandates set forth in the DEA Guidelines and the Letters of Instruction to U.S. Ambassa-

dors when conducting operations involving both the United States and a foreign country. The answer, set forth in detail above, is that no such discretion exists.

The Governments' reliance on *Flax v. United States,* 847 F.Supp. 1183 (D.N.J.1994) (actions of FBI agents in conducting surveillance and investigation fell within discretionary function exception to FTCA) and *Pooler v. United States,* 787 F.2d 868 (3rd Cir.), *cert. denied,* 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986) (decision whether to use informant to conduct a drug investigation in VA hospital and extent of control to maintain over informant were discretionary functions immune from liability under FTCA) are unpersuasive. Both cases involved governmental decisions as to whether to undertake or initiate specific criminal investigations and to what extent to carry them out. There is no indication that the Government agents involved in those cases failed to comply with specific mandates requiring particular conduct.

Finally, it should be emphasized that law enforcement activities can generally be characterized as discretionary in nature. However, not all law enforcement actions are the type of discretionary decisions that are rooted in the social, economic or public policy concerns that formed the basis of the discretionary function exception to the FTCA. The decision, or inadvertence, of the United States to fail to comply with "fixed or ascertainable standards" set forth in the DEA Guidelines and the Letter of Instruction neither implicates public policy, nor lends itself to policy analysis. *See Autery,* 992 F.2d at 1529, 1531. The Government, as confirmed by the sealed exhibits introduced at trial, simply did not follow specific mandates. There was no element of judgment or discretion involved. Nothing in this opinion should be interpreted as judicial second-guessing of a covert sting operation. The Court recognizes the Government's need for freedom in initiating and conducting undercover sting operations. Nonetheless, the Government is required to abide by the existing rules and Guidelines that govern such operations. In particular, because the sting operation in question involved the DEA and Honduras,

the Government was required to adhere to the DEA Guidelines on Foreign Relations and the Letter of Instruction to the Ambassador of Honduras. Because these requirements were not met, the discretionary function exception to the FTCA is not applicable and the Government's Motion for Judgment as a Matter of Law must be DENIED.

DONE AND ORDERED.

## APPENDIX

1) Letter of Instruction from President Bush to Ambassador Arcos, July 26, 1990.
2) Chapter 65 of the Guidelines for DEA Foreign Activities, Subsection E, Inter–Agency Responsibilities

## APPENDIX 1

## THE WHITE HOUSE

## WASHINGTON

July 26, 1990

Dear Mr. Ambassador:

I send you my very best wishes and appreciation for your efforts as Chief of the United States Mission in the Republic of Honduras. We are entering a new, exciting time of change in international relations. The postwar era is drawing to a close. As leader of the democracies, our Nation faces an historic opportunity to help shape a freer, more secure, and more prosperous world, in which our ideals and our way of life can truly flourish. As President, I intend to advance these objectives and United States interests around the globe, and I look to you, as my personal representative in Honduras, as my partner in this task.

As my representative, you, along with the Secretary of State, share with me my constitutional responsibility for the conduct of our relations with Honduras. I charge you to exercise full responsibility for the direction, coordination, and supervision of all Executive branch U.S. offices and personnel in Honduras, except for personnel under the command of a United States area military commander, personnel under the authority of the Chief of another U.S. Mission (for example, one accredited to an international organization), or

personnel detailed to duty on the staff of an international organization.

The Secretary of State is my principal foreign policy advisor. You will receive policy guidance and instructions from him or from me. Except in the most unusual circumstances, as I shall determine, messages on policy proposals and policy implementation will be sent to you through official Department of State channels. You will normally report through the Secretary. I want to emphasize that the Secretary of State has the responsibility not only for the activities of the Department of State and the Foreign Service, but also, to the fullest extent provided by law, for the overall coordination and supervision of United States Government activities abroad.

You are to provide strong program direction and leadership to all Executive branch agency activities to carry out United States foreign policy. It is also your responsibility to foster conditions in which our regional or worldwide activities can achieve success. I have notified all heads of departments and agencies accordingly and instructed them to inform their personnel in the United States and abroad.

You should cooperate fully with personnel of the U.S. Legislative and Judicial branches in Honduras so that United States foreign policy goals are advanced, security is maintained, and Executive, Legislative, and Judicial responsibilities are carried out.

You should instruct all Executive branch personnel under your authority of their responsibility to keep you fully informed at all times of their current and planned activities, so that you can effectively carry out your responsibility for United States Government programs and operations. You have the right to see all communications to or from Mission elements, except those specifically exempted by law or Executive decision.

As Commander in Chief, I retain authority over United States Armed Forces. On my behalf you have responsibility for the direction, coordination, supervision, and safety, including security from terrorism, of all Department of Defense personnel on official duty in Honduras, except those personnel under the command of a U.S. area military commander. You and such commanders must keep each other currently informed and cooperate on all matters of mutual interest. Any differences that cannot be resolved in the field should be reported by you to the Secretary of State; unified commanders should report to the Secretary of Defense.

I expect you to report with directness and candor. If there are policies or programs with which you or personnel under your authority disagree, the Secretary of State and I will always welcome the opportunity to consider alternative courses of action. Nevertheless, there can be only one United States policy, which I expect you and all members of your Mission to follow and articulate.

I am committed to a lean personnel profile overseas for reasons of foreign policy, security, and economy. Thus, it is my policy that overseas staffing be tied directly to the accomplishment of specific national goals, and reduced whenever and wherever possible. I therefore want you to assess regularly the staffing levels and overall costs of every element of your Mission to make certain they are consistent with our overall efforts to reduce the official U.S. presence abroad. You may initiate changes when you believe the staffing of any agency is either inadequate or excessive to the performance of essential functions. Every agency under your authority, including the Department of State, must obtain your approval for any change in the size, composition, or mandate of its staff. You must make the hard choices, and I expect you to relate Mission resources directly to priority policy and program activities, genuine need, and safety. However, you should be aware that overall staff reductions notwithstanding, some diplomatic missions may, as the need arises, be asked to accept augmentation to meet new and pressing national security demands.

If an Agency head disagrees with you regarding staffing, he may inform the Secretary of State, to whom I have delegated responsibility for resolving such issues. In the event the Secretary of State is unable to resolve a dispute, the Secretary of State and the Agency head will present their respective

views to me, through my Assistant for National Security Affairs, for decision. In such instances, both the Secretary of State and I will uphold the party arguing for the best use of increasingly scarce resources.

The protection of all United States Government personnel on official duty abroad and their accompanying dependents is a crucial responsibility in this dangerous time. You must always keep security in the forefront of your concerns. The security of your Mission is your direct, personal responsibility. I also expect you to support strongly counterintelligence and counterterrorism activities that enhance security both locally and in the broader international context.

I know you share my total commitment to fair and equitable treatment for all, regardless of race, color, creed, sex, or national origin. It is your duty to demonstrate our shared commitment to equal employment opportunity. I expect you to run your Mission in an atmosphere free of discrimination. From my own personal experience as an Ambassador, I know that there are many ways you can foster a positive climate in this important regard by your own emphasis and example.

I also expect the highest standards of professional and personal conduct from all United States Government personnel. Public service is a trust requiring government personnel to place public duties above private interests. Accordingly, they must abide by the highest ethical standards. To ensure that the American people retain complete confidence in the integrity of their government, government personnel must abide not only by the letter of regulations but also by the spirit of public service. You have the authority and my full support to ensure that ethical conduct is a hallmark of our presence overseas, both on and off the job.

I am sure you will represent the United States with imagination, energy, and skill. You have my full personal confidence and best wishes.

Sincerely,

/s/George Bush

The Honorable Cresencio S. Arcos, Jr.
American Ambassador
Tegucigalpa, Republic of Honduras

## APPENDIX 2

**DEA SENSITIVE**
This manual is the property of the Drug Enforcement Administration
Neither it nor its contents may be disseminated outside the agency to which loaned.

CHAPTER 65 FOREIGN OPERATIONS

PX-12

This manual is the property of the Drug Enforcement Administration. Neither it nor its contents may be disseminated outside the agency to which loaned.

## CHAPTER 65 FOREIGN OPERATIONS

### 651 GUIDELINES FOR DEA FOREIGN ACTIVITIES

These guidelines apply to both DEA personnel stationed at foreign posts of duty and DEA personnel on assignment from a domestic post of duty.

A. Directions From United States Ambassadors

1. General Directions. DEA representatives, like all other official United States personnel abroad (excepting certain military commands), are under the full authority of the Ambassador. The Ambassador is expected to assist and give policy guidance to DEA activities in such a way as to assure that the DEA mission is realized to the maximum extent possible. The U.S. Drug Control Program is a high priority matter, and the United States Government supports as vigorous an approach as possible within the overall U.S. objectives in each foreign country.

2. Daily Operations Controlled by DEA. Routine DEA operations in foreign countries are under the chain of command of DEA management. At the same time, DEA Country Attaches shall operate within the policies established by the Ambassador in that country. Whenever a DEA activity, in the judgment of the Ambassador, may jeopardize relations between the host country and the United States, or is otherwise determined by him to be undesirable, the Ambassador's decision to disapprove of or suspend such activity shall be determinative. Should this occur, DEA field offices will advise Headquarters of the decision immediately.

B. Agreements With Host Governments

1. No Unilateral Activities. DEA representatives will not engage or participate in unilateral investigative operations or other activities outside the scope of the formal or informal agreement developed between the United States and the host government unless these activities have the express and explicit approval of a responsible host government official, the Ambassador, the DEA Country Attache and the DEA Administrator.

2. Historical Perspective. The activities of DEA with respect to its drug control programs in foreign countries are carried out in accordance with one or more or the following:

 a. Artical 35 of the 1961 Single Convention on Narcotic Drug.

 b. Formal written Agreements, Protocols, Terms of Reference, Letters of Exchange, or Memoranda of Understanding.

 c. Informal agreements between the United States Government/DEA and host governments, their designated drug control agencies, and authorized host country officials.

 d. Regulations, orders, manuals, notices and other policy guidance and guidelines issued by the Department of Justice or DEA.

NOTE: Unless specific allowance is made under the provisions of this manual or the written authority of Headquarters (AD), the policies and procedures contained in this manual are fully applicable to DEA's foreign operations.

This material is the property of the DEA.
Neither it nor its contents may be disseminated outside the agency to which loaned.

o. Provide, to the extent possible, appropriate information obtained by DEA that will enable host government officials to carry out investigations of or operations against international drug traffickers.

p. Coordinate and assist in matters regarding Letters Rogatory, joint prosecutions and requests for judicial assistance.

D. Intelligence. - DEA representatives generally may conduct the following intelligence activities in foreign counties:

1. Identify major drug violators and trafficking organizations.

2. Select intelligence targets and develop Major Organization Reports.

3. Collect long-range strategic intelligence relative to trafficking routes, trends of the traffic, and methods of drug concealment.

4. Analyze drug intelligence as fully as possible in order to integrate it with drug suppression programs in foreign countries and the United States.

5. Collect and develop intelligence relative to couriers, profiles, and smuggling routes and methods, for transmittal to the U.S. Customs Service and the U.S. Coast Guard in support of their primary interdiction responsibilities.

6. Collect intelligence relative to precursors and equipment used in the production of illicit controlled substances.

7. Collect strategic intelligence relative to the production of illicit narcotic crops and production of interim substances, e.g., coca paste, morphine base, etc.

E. Inter-Agency Responsibilities

1. DEA representatives shall coordinate with the Embassy Narcotics Coordinator at post all sensitive or unusual DEA activities conducted in-country and, to the extent determined by the Ambassador, keep him informed of routine activities.

2. Senior DEA officials in embassies shall, as members of the U.S. Mission Narcotics Committee, participate in the planning, preparation, implementation, and assessment of bilateral drug control programs.

3. DEA representatives shall, immediately upon the receipt of information with respect to the arrest of a United States person, notify the nearest appropriate U.S. Consular official.

4. Orders, guidelines or policies implemented between the U.S. Mission and DEA shall be submitted immediately to DEA Headquarters by the senior DEA representative at post.

5. During the course of their normal duties, DEA representatives may encounter nondrug intelligence that would be of value to other U.S. agencies. This type of intelligence shall be documented by DEA and provided by the most expeditious means to the appropriate U.S. agency.

F. Sources of Information (see also Subchapter 661)

1. DEA representatives shall locate and develop sources of information, informants and defendant/informants who can provide information relative to the highest levels of the illicit drug traffic.

- 194 -

