Richard N. **BRUNEAU**, Plaintiff

v.

**UNITED STATES of America,**
Defendant

No. 97–30242–MAP.

United States District Court,
D. Massachusetts.

July 3, 2001.

---

Stephen Ferrarone, Springfield, MO, for Plaintiff.

Karen L. Goodwin, United States Attorney's Office, Springfield, MO, for Defendant.

## MEMORANDUM REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### (Docket No. 62)

PONSOR, District Judge.

### I. INTRODUCTION

Plaintiff Richard N. Bruneau has brought this action against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.*, for injuries he sustained in a fire rescue training course run by the Air Force. The government has moved for summary judgment, arguing that the claim is barred by the "discretionary function" exception to the FTCA's waiver of sovereign immunity. 28 U.S.C. § 2680(a) (1994). Unfortunately, although the government's negligence is arguable, and Bruneau's injuries are significant, the government's motion must be allowed. The decisions of the Air Force that allegedly caused plaintiff's injuries allowed room for the exercise of discretion, and were susceptible to policy-related analysis. They therefore meet the requirements of the discretionary function exception and bar his claim.

### II. BACKGROUND

Richard Bruneau was a firefighter in the Massachusetts Air National Guard. In April, 1995, he enrolled in an advanced fire rescue course at the Air Force Fire Academy in San Angelo, Texas. Bruneau had extensive military and firefighting experience at the time he enrolled in the course. He had spent several years in the Navy, part of the time teaching survival, evasion, resistance and escape ("SERE") to special forces trainees, and also as an instructor for the Navy SEALs. At some point after his military career he became a prison guard, but eventually took a pay cut to become a firefighter at the Barnes Air National Guard Base in Westfield, Massachusetts. By all accounts, Bruneau was a dedicated and ambitious firefighter. He enrolled in the Texas course to improve his abilities, to better serve his department, and to advance his firefighting career.

The Texas course was intended to train students in "confined space rescue operations" and the use of a self-contained breathing apparatus (SCBA). A confined space rescue operation is a rescue from a tight space, such as a collapsed building, where movement is difficult and the dangers of smoke inhalation are great. It was a demanding course reserved for students, like Bruneau, who had already completed basic firefighting instruction.

On the first day of the course, April 6, Bruneau and his fellow students were instructed on use of the SCBA. On the following day, Bruneau alleges, despite the lack of any further preliminary instruction, the course leapt to a rigorous test in a confined space "trainer." The trainer, known as a "Fun House" among Air Force personnel, was a building consisting of darkened tunnels with obstacles and ramps. Bruneau and his classmates were required to navigate their way through the extremely tight spaces in the darkened trainer in 15 minutes while breathing through an SCBA apparatus. They were

to do so alone and without a lamp or ropes to guide them.

When it was his turn, Bruneau entered the trainer and crawled up to a second floor landing. As he started to proceed from the landing, he toppled over an incline he could not see and became wedged next to a wall. As he struggled to get up, remove his pack and crawl back up the incline, he experienced severe neck pain.

Bruneau was immediately removed from the trainer and told to rest. After being examined by an emergency medical technician, he indicated that his neck felt somewhat better and agreed to continue on to the next training ground, an obstacle course. After completing the first five portions of the course, Bruneau collapsed in pain and was taken away by ambulance.

The accident in the trainer caused severe damage to Bruneau's back, neck, arm, elbow and head. After multiple operations, he is left with constant pain in his elbow, requiring pain medications and intramuscular shots which have a side effect of significantly reducing the strength of his left hand. He has not been able to perform active duty as a firefighter since the day of the accident.

## III. DISCUSSION

### A. Summary Judgment Standard.

A court may properly allow a motion for summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993). Initially, the moving party must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to avoid summary judgment, the nonmoving party carries the burden of establishing a genuine issue of material fact as to every element of the case. *See Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991). In determining whether a genuine issue exists for trial, facts and inferences from facts are to be viewed in the light ·most favorable to the non-movant. *See Diaz v. City of Fitchburg,* 176 F.3d 560, 561 (1st Cir.1999).

### B. Sovereign Immunity and the Discretionary Function Exception to the FTCA.

The Federal Tort Claims Act is the sole mechanism to obtain damages from the federal government for negligence to individuals. Before the enactment of the FTCA in 1946, the government was immune from all tort suits because of the general rule of "sovereign immunity"—the government may not be subjected to suit against its will. *See Dalehite v. United States,* 346 U.S. 15, 24–25, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The idea of sovereign immunity derives from the British legal fiction that "the King can do no wrong," *Feather v. The Queen,* 122 Eng. Rep. 1191, 1205 (Q.B.1865), and therefore can never appear as a defendant in "his" own courts. *See United States v. Lee,* 106 U.S. 196, 208, 1 S.Ct. 240, 27 L.Ed. 171 (1882).[1]

---

1. The first major Supreme Court examination of the sovereign immunity of the United States came in *Lee,* a takings case brought by descendants of Robert E. Lee over land they owned in Virginia that the government converted into Arlington National Cemetery.

Justice Miller, writing for the Court, first noted and accepted the rule that the United States may not, as a named party, be subjected to suit against its will. Nonetheless, in holding that a takings claim could proceed against the individual agents of the govern-

Despite its lack of clear textual support in the Constitution and its conflict with the fundamental American concept of *popular* sovereignty, the doctrine has firmly transplanted itself onto American soil, both as to the federal government and the states. *See generally College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999); *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997). The only way the United States may be sued is if it consents to suit, through Congressional enactment or waiver in a particular case.

To be sure, our tradition as a constitutional republic has lead to some discomfort with a rule that is, as Justice Breyer has observed, "more akin to the thought of James I than of James Madison." *College Sav. Bank*, 527 U.S. at 704, 119 S.Ct. 2219 (Breyer, J., dissenting). This discomfort has produced a maze of judicially-recognized exceptions to state and federal sovereign immunity. *See, e.g., Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (allowing plaintiff subjected to illegal search by federal agents to bring action for damages under Fourth Amendment itself); *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (allowing suits for injunctive relief, but not damages, against state agents in individual capacities). However, a detailed navigation of the exceptions to sovereign immunity is unnecessary here. This controversy concerns only the extent of an explicit Congressional waiver of immunity.

Before the enactment of the FTCA, the only way an injured person could receive compensation for the torts of government agents was through a private bill in the Congress. *See The Federal Tort Claims Act: A Proposal for Institutional Reform*, 100 COLUM. L. REV. 1538, 1540 (2000). As the federal government expanded its activities in the early part of the last century, however, "its agents caused a multiplying number of ... wrongs which would have been actionable if inflicted by an individual or a corporation but [were] remediless solely because their perpetrator was an officer or employee of the Government." *Feres v. United States*, 340 U.S. 135, 139–40, 71 S.Ct. 153, 95 L.Ed. 152 (1950). As a result, Congress was flooded with thousands of private bills every year, causing a strain on its resources. *See Dalehite*, 346 U.S. 15, 25 n. 9, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).[2] Because of the

---

ment who wrongly held the property, Justice Miller expressed doubts about the justification for the doctrine in this country. He aptly contrasted the enduring monarchist view of sovereign immunity in Great Britain with the prevailing political thought in the United States.

> Notwithstanding the progress which has been made since the days of the Stuarts in stripping the crown of its powers and prerogatives, it remains true today that the monarch is looked upon with too much reverence to be subjected to the demands of the law as ordinary persons are, and the king-loving nation would be shocked at the spectacle of their queen being turned out of her pleasure garden by a writ of ejectment against the gardener.

*Lee*, 106 U.S. at 208, 1 S.Ct. 240. By contrast:

> Under our system, the *people*, who are there called *subjects*, are the sovereign. Their rights, whether collective or individual, are not bound to give way to a sentiment of loyalty to the person of the monarch. The citizen here knows no person, however near to those in power, or however powerful himself, to whom he must yield his rights which the law secures to him when it is well administered.

*Id.*

**2.** In the Seventieth Congress (1927–29), for example, 2,268 private claim bills were introduced, seeking more than $100,000,000. Of these, 336 were enacted—144 of them for tort

substantial amount of time these bills took away from legislative matters, combined with the sense that the government should avoid the appearance of political favoritism in providing such compensation, Congress chose to open the government to liability in the federal courts. *See* Levine, *supra* at 1539 n. 7.

■ The FTCA's waiver of sovereign immunity provides that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674 (1994). This broad promise of liability, however, is subject to several exceptions. The broadest and most malleable of these is the "discretionary function" exception, which reserves the United States' immunity regarding any act based upon a government employee's exercise of discretion. *See* 28 U.S.C. § 2680(a). It shields any government act

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* In other words, no matter how negligently a government employee may have acted, if his or her acts or omissions were part of the employee's "discretionary function," suits for negligence are barred. *Id.*

As a theoretical matter, the rationale for the discretionary function exception is relatively easy to perceive. Congress did not want the courts "second-guessing" the policy decisions of the legislature or the executive through the medium of tort law. *Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). The "parade of horribles" that could be marshaled by unfettered governmental liability is instantly apparent: it could include suits, for example, over negligent troop deployment in war, for failing adequately to prepare for hurricanes, or over the aviation administration's wrongful approval of an unsafe airplane, resulting in a crash. Not only could such lawsuits deter the necessary exercise of governmental discretion, Congress believed, but they could sap the budget of the United States and pose a danger to the separation of the judicial and the political branches. The discretionary function exception, it is said, "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Not surprisingly, perhaps, defining the boundaries of this doctrine has been difficult. For roughly the first forty years of the FTCA, the exception protected choices made at the "planning" stage, but not those made in the implementation of governmental policy. In the first Supreme Court case to examine the exception, the majority held that the act protects "the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law." *Dalehite*, 346 U.S. at 34, 73 S.Ct. 956. Thus, "it ... includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Id.* at 35–36, 73 S.Ct. 956; *see also Indian Towing Co. v. United States*, 350 U.S. 61, 64, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (allowing suits over decisions made

claims. *See Dalehite,* 346 U.S. at 24 n. 9, 73 S.Ct. 956.

at "operational level"). After this line of analysis was established, courts generally applied the exception to planning-type decisions, leaving later operational choices exposed to liability.[3]

This distinction survived until a series of Supreme Court cases replaced it with the current formulation of the exception. *See United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *Varig Airlines,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). In these decisions, the Court expressly abandoned the distinction between planning and application, refocusing the inquiry on "the nature of the conduct rather than the status of the actor." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. 2755; *see also Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. The scope of the protection, the Court held, would extend to discretionary actions by government employees, whatever their rank, that are "of the kind that the discretionary function exception was designed to shield," namely, those "based on considerations of public policy." *Id.* at 536–37, 108 S.Ct. 1954.

The resulting test provides that the discretionary function exception will shield government acts from liability if the acts (1) involve "an element of judgment or choice," *Berkovitz,* 486 U.S. at 536, 108

S.Ct. 1954, and (2) "are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267; *see also Shansky v. United States,* 164 F.3d 688 (1st Cir.1999); *Attallah v. United States,* 955 F.2d 776 (1st Cir.1992). To meet the first prong, the government need only show that there was "room for choice" in its decisions. *Attallah,* 955 F.2d at 783. To meet the second prong, it must be demonstrated that "some plausible policy justification could have undergirded the challenged conduct." *Shansky,* 164 F.3d at 692. The government need not prove that the acts were in fact driven by considerations of public policy, because the inquiry focuses on the classification of the decision, not the subjective intent of the decisionmaker. *See id.*

Thus, as the law has developed, it has become increasingly apparent that the United States is *not* always "liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674 (1994). Despite the FTCA's seemingly broad waiver of sovereign immunity, courts may not even make basic inquiries into the reasonableness of the government's safety choices, as they would do with any other defendant in a negligence case. Such routine examples of negligence law as the failure to install handrails, *Shansky,* 164 F.3d 688; *Ayer v. United States,* 902 F.2d

---

**3.** Professor Harold J. Krent has described the federal courts' jurisprudence under the planning/operational distinction:

> In general, broad policies formulated by government were protected, but applications of those policies were not. For instance, the decision to warn pilots whenever flight conditions posed a hazard was held to be protected by the discretionary function exception; but application of that policy to particular hazardous conditions was subject to suit. Determining where to place power lines was held to fall within the exception, but negligently stringing the wires or failing to warn of their existence

was not. Some cases are simply difficult to fit into any pattern, such as courts' conclusions that the discretionary function exception protected national park employees' handling of a marauding bear, the government's supervision of migratory workers, or government engineers' negligence in performing dredging operations. Due to its amorphous nature, the planning versus operational level approach received much criticism from commentators.

Harold J. Krent, *Preserving Discretion Without Sacrificing Deterrence: Federal Governmental Liability in Tort,* 38 UCLA L. REV. 871, 880 (1991) (internal citations omitted).

1038 (1st Cir.1990); failure to warn of hidden dangers on land, *Rosebush v. United States,* 119 F.3d 438 (6th Cir.1997); and failure to warn of hazardous working conditions, *Shuman v. United States,* 765 F.2d 283 (1st Cir.1985), are off limits to any possible assessment of liability. As one Circuit Judge has described it, "two hundred years after we threw out King George III, the rule that 'the king can do no wrong' still prevails at the federal level in all but the most trivial of matters.... [T]he FTCA (and for that matter Congress' injunction that a program be carried out safely) is largely a false promise in all but 'fender benders' and perhaps some cases involving medical malpractice by government doctors." *Allen v. United States,* 816 F.2d 1417, 1424–25 (10th Cir. 1987) (McKay, C.J., concurring). More colorfully, another Circuit Judge has stated that "the discretionary function exception has swallowed, digested and excreted the liability-creating sections of the Federal Tort Claims Act." *Rosebush,* 119 F.3d at 444 (Meritt, C.J., dissenting).

## C. *The Training Exercise.*

■ The government argues that it is entitled to summary judgment because the design of the confined-space trainer involved an exercise of discretion by the Air Force that was susceptible to policy-related analysis. *See Shansky,* 164 F.3d at 691. This argument, of course, has nothing to do with whether the government was negligent in running the training. Under what would be the applicable Texas law (and generally in all jurisdictions) questions of reasonableness or negligence are primarily for the jury to decide. *Southwest Guar. Trust Co. v. Providence Trust Co.,* 970 S.W.2d 777, 783 (Tex.App.—Austin 1998). From the record, it does appear that a rational jury could find the Air Force negligent, as Bruneau alleges, in failing to make use of the "buddy system,"

provide a light, or allow use of ropes for guidance. As outlined above, however, the court's only inquiry, for summary judgment purposes, is whether the conduct Bruneau challenges left room for choice by the Air Force and was susceptible to policy-related analysis. If both parts of this test are met, the claim is barred.

Bruneau essentially concedes that the second prong applies here. Any decisions the Air Force made regarding the design of the trainer were decisions of how best to train firefighters, a matter of policy. Even if the matter were not conceded, the policy choices are transparent: the design of the exercise involved assessment of firefighting needs, budgetary constraints, safety concerns, and other significant areas of firefighting policy. *See* Def. Ex. 6, Docket No. 63, Decl. of James Pololske, ¶¶ 11–12. This is the kind of decision that Congress intended to protect from liability.

For his claim to survive, therefore, Bruneau must show that the Air Force violated a directive it had no choice but to follow. Plaintiff's counsel has resourcefully argued that several considerations eliminated official discretion.

### 1. *OSHA Regulation.*

■ Bruneau first points to an occupational safety regulation that he says applies to the confined space training area. The regulation imposes standards intended to protect employees in general industry from "hazards of entry into permit-required confined spaces." 29 C.F.R. § 1910.146(a) (1999). It mandates certain duties of care on the "employers" operating such confined spaces, such as establishing an entry permit system, testing for vapors, and providing proper equipment, such as lights. According to plaintiff, it also requires the government to "inform each rescue team of hazards" associated

with the trainer, which plaintiff says was not done. 29 C.F.R. § 1919.146(k)(iv).

Unfortunately for Bruneau, the term "employer" in the regulation "means a person engaged in a business affecting commerce who has employees, but does not include the United States . . . ." 29 U.S.C. § 652 (1999); 29 C.F.R.1910.2(c). The directive is therefore not binding on the United States, leaving the Air Force a "rightful option" not to follow it. *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954. Additionally, it is doubtful that the regulation would apply to the trainer in any event, as its main focus is on averting atmospheric hazards that are not a factor in the trainer. *See generally* 29 C.F.R. § 1910.146.

### 2. *NFPA 1470.*

Bruneau next points to the standards of the National Fire Protection Association (NFPA), a group that promulgates regulations for firefighting. The NFPA standards are binding on the Air Force by its own regulations. *See* Pl.Ex. 4, Docket No. 68, Air Force Directive 32–20 § 1.2.3 (requiring Air Force to comply with NFPA standards). Nevertheless, the government claims the directives relied on by the plaintiff are either inapplicable to the training exercise or do not cabin the Air Force's discretion in any significant way.

The first NFPA regulations at issue are contained in a series called "NFPA 1470," entitled "Standard on Search and Rescue Training for Structural Collapse Incidents." *See* Pl.Ex. 11, Docket No. 68, NFPA 1470. The government concedes that these regulations are applicable to the confined-space trainer, but argues that they give the Air Force significant room for choice in their application. The provisions Bruneau cites include a regulation providing that search and rescue training be conducted "in a safe and effective manner while using appropriate personal pro-

tective equipment." NFPA 1470 § 5–1.2, *supra.* Another requires "protective clothing and equipment," that is "appropriate to the tasks that are expected to be performed during structural collapse training exercises." NFPA 1470 § 5–3.1, *supra.* According to the government, these requirements are too vague to deprive the Air Force of its "room for choice." *Attallah,* 955 F.2d at 783.

Bruneau disagrees, arguing that the standards require certain protections commonly afforded in the firefighting community. He asserts, from his own expertise and from ordinary custom and usage in firefighting, that "appropriate personal protective equipment" in a darkened tunnel includes a crowbar, a light, and guidelines, any of which might have averted his injury, and all of which were denied him in the training exercise.

The government has the stronger argument. Merely requiring training to be conducted "in a safe and effective manner" with "appropriate" equipment does not remove any significant discretion from Air Force Officials, whatever the normal usage might be in firefighting. In this respect, the case is indistinguishable from *Ayer,* a complaint over the failure to install railings at an Air Force base. There, a regulation required the Air Force "to achieve the optimum degree of safety within the constraints of operational effectiveness." *See Ayer,* 902 F.2d at 1043. The Court of Appeals held that this regulation "clearly directs the Air Force and other military departments to exercise discretion . . . ." *Id.* (internal quotations omitted), *citing Totten v. United States,* 806 F.2d 698, 702 (6th Cir.1986). The same is true of NFPA 1470.

### 3. *NFPA 1500.*

Finally, Bruneau asserts that NFPA 1500, entitled "Fire Department Occupa-

tional Safety and Health Program," required safeguards that could have averted his injury. *See* Pl.Ex. 10, Docket No. 68, NFPA 1500. Specifically, he points to provisions in Chapters 5 and 6 that require protective clothing and teams of two or more. In response, the government points out that these chapters of NFPA 1500 apply not to training, but rather to actual firefighting. In the government's view, Chapter 3 of NFPA 1500, entitled "Training and Education," is the chapter applicable to training exercises, and the wording of this chapter is too vague to deprive the Air Force of choice. *See* NFPA 1500, *supra*, at 11–12. Bruneau points to language in other portions of NFPA 1500 that does refer to training, and argues that all standards in the series should apply.

Again, the government has the better argument. The most specific section of NFPA 1500 on which Bruneau relies is § 5-3.3, which states, "Members using SCBA shall operate in teams of two or more." *See id.* at 16. Bruneau was wearing SCBA, but was not allowed to operate in a team of two or more. However, read in the context of the rest of the chapter it is clear that the directive does not apply to training, but to actual firefighting. Apart from the fact that the requirement does not appear in the "Training and Education" chapter, the provisions surrounding it explicitly relate to firefighting. *See, e.g.,* NFPA 1500 § 5-2.2, *supra* ("Members who engage in or are exposed to the hazards of structural fire fighting shall be provided with and shall use helmets...."); § 5-3.2 ("SCBA shall be provided for and shall be used by all members working in areas where (a) the atmosphere is hazardous, (b) the atmosphere is suspected of being hazardous (c) the atmosphere may rapidly become hazardous.") . Nor is there any reason to relate this provision back to the training chapter. Training may well be more effective, as a general manner,

when performed solo, while the "buddy system" could be seen as essential for actual firefighting.

The other sections of NFPA 1500 Bruneau cites, like those of NFPA 1470 previously examined, are unhelpful to his claim. Section 5-1.1 requires the Air Force to provide "appropriate protective clothing," while § 6-4.3 requires that those operating "in hazardous areas at emergency incidents shall operate in teams of two or more." *Id.* at 15, 22. The latter provision explicitly does not relate to training, while the former is too vague to limit the Air Force's discretion. Finally, § 6-1.1, requiring those who run training exercises to conduct them "in a manner that recognizes hazards and prevents accidents and injuries," is again too general to deprive the Air Force of its room for choice. *Id.* at 20.

## IV. CONCLUSION

It is not possible to view the result in this case with any satisfaction. The plaintiff appears to have a good argument, supported by reasonable evidence, that the failure of the officials responsible for the training course to use reasonable care caused him severe injuries and a substantial disability lasting to this day. But, despite his attorney's vigorous efforts, he will never have a chance to see whether these arguments might impress a factfinder and result in an award of damages. Clear authority bars this claim under the "discretionary function" exception to the FTCA, even in a context that appears rather routine and administrative. Under these circumstances the court is unfortunately constrained to allow the defendant's motion for summary judgment.

A separate order will issue.