**NORTHERN VOYAGER LIMITED PARTNERSHIP, and Commercial Union Insurance Company**

v.

**THAMES SHIPYARD AND REPAIR COMPANY, and the United States of America**

**Civil Action No. 99–12243–RWZ.**

United States District Court,
D. Massachusetts.

April 17, 2002.

Michael J. Rauworth, Maura K. McKelvey, Cetrulo & Capone LLP, Boston, MA, for Plaintiffs.

David Farrell, Jr., Connors & Farrell, South Chatham, MA, for Consolidated Plaintiff.

Thomas J. Muzyka, Robert E. Collins, Clinton & Muzyka, Boston, MA, for Defendant Thames Shipyard.

John R. Geraghty, Geraghty Law Firm, Hackensack, NJ, Peter F. Frost, United States Department of Justice, Civil Division, Washington, DC, for Defendant U.S.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

On the morning of November 2, 1997, while approximately two miles off the coast of Gloucester, Massachusetts, the F/V NORTHERN VOYAGER (the "VOYAGER"), a 144 foot fishing boat, began experiencing steering difficulty. Although the weather was clear at the time, a passing storm had left behind swells of approximately seven to eight feet in height. The boat's chief engineer, Gary Tibbo ("Tibbo"), was in the wheelhouse with the boat's mate, Peter Flaherty ("Flaherty"). Flaherty began to notice that the boat was starting to make circles in the water, despite the fact that it was set on automatic pilot for a straight course. He asked Tibbo to check the steering gear.

The interior steering gear is located in a space hole called the lazerette. The lazerette is designed to be isolated from the rest of the vessel so that if a rudder is lost or damaged, the resultant flooding can be contained, rather than endanger the entire boat. There are two manholes by which one may gain access to the lazerette, each equipped with watertight covers. If these covers are closed, the lazerette becomes watertight and can flood without affecting the stability of the vessel. The VOYAGER had an electrical pump in the lazerette to counter the unusually high leakage from the rudder. Both manholes to the lazerette had been kept open for easy access to

check the pump. When Tibbo entered the lazerette, he found that it was flooded and water was welling up through the starboard manhole. The pressure from the flooding prevented him from closing the manhole cover. He then started to suction out the water with a bilge pump and informed the other crew members of the problem.

Tibbo told the Captain about the flooding, which by that point had entered the machinery space. At Tibbo's suggestion, the Captain called the Coast Guard to report his position and condition and request pumping assistance. During the radio exchange, the Captain voiced his concern about the possibility that water would flood the engine room. If the engine room flooded, all of the boat's electrical pumps and generators located therein would be rendered useless.

*The Coast Guard Response*

Coast Guard Station Gloucester ("Station Gloucester") responded to VOYAGER's call for assistance, and immediately launched its 41 foot boat into the seven to eight foot swells. Shortly thereafter, the Coast Guard's 47 foot boat began to follow the 41 footer to the scene. At about the same time, Coast Guard Group Boston ("Group Boston"), which had also heard the call for assistance, issued an Urgent Marine Information Broadcast ("UMIB"), to alert all listeners to the VOYAGER's situation. Group Boston then assumed the duties of Search and Rescue ("SAR") Mission Coordinator and began to monitor the case. It also diverted a 110 foot Coast Guard Cutter to assist as the On Scene Coordinator ("OSC").

*The Rescue*

At 9:13 a.m., the Coast Guard's 41 foot boat arrived at the VOYAGER and evacuated eight crew members. The Coast Guardsmen then began boarding the fishing boat with additional pumps. With the crew's guidance, they tried to dewater the vessel. Coast Guardsman Sean Connors told VOYAGER's Master, David Haggerty, that they would try to keep up with the flooding, but that their main objective was to ensure the safety of the VOYAGER crew members who were still on board. As the flooding continued, the VOYAGER began to develop a port side tilt. This made both access to and escape from the boat more difficult. By the time the decision was made to fully evacuate the boat, the crew had to jump down several feet from the right side of the VOYAGER to the Coast Guard's 47 footer. When the OSC arrived, the Commanding Officer decided to defer to the judgment of those who had already been on scene from the start. Although he expressed discomfort with the Coast Guardsmen remaining on the sinking vessel, he agreed that they could assist as long as it was safe for them to do so. The condition continued to worsen and Coast Guard Officer Dittes ("Dittes") began to question VOYAGER crew members about the boat's construction. Based on the information gleaned from one of the crew members and on the continual progression of the flooding, Dittes became concerned that the boat would capsize at any moment. The decision to evacuate was met with opposition from VOYAGER's Captain, who insisted that other options for salvage were available. Specifically, he requested to stay on the scene to await the arrival of a commercial salvor who had responded to the initial UMIB. Despite the Captain's request, Dittes ordered the evacuation of all remaining Coast Guard personnel and crew members from the VOYAGER. Fifty minutes later the vessel capsized and sank to the bottom of the ocean where it remains today.

Plaintiffs brought suit against the United States Coast Guard and the Thames

Shipyard Repair Company (the "Shipyard"). They allege that the United States is subject to liability under the Suits in Admiralty Act ("SAA"), 46 U.S.C.App. §§ 741–52, for its negligent interference with the VOYAGER salvage efforts. In addition, the Complaint sets forth a laundry list of intentional torts that includes trespass to chattels, conversion, breach of fiduciary obligations, and intentional interference with contractual relations. Defendant United States moves for summary judgment based on theories of comparative negligence, the discretionary function exception, and the Good Samaritan doctrine. Although both sides vigorously dispute the cause of the flooding, the timing of the evacuation, and the impact of the Coast Guard's decisions on the VOYAGER's fate that day, these disputed facts are wholly immaterial in light of the clearly applicable discretionary function exception.

*The Suits in Admiralty Act*

The SAA acts as a waiver of United States sovereign immunity for certain maritime claims against it. *Gercey v. United States,* 540 F.2d 536, 539 (1st Cir. 1976). Unlike the Federal Torts Claim Act ("FTCA"), 28 U.S.C. § 2680(a), the SAA does not contain an express exception for harm caused by the government in the exercise of its discretionary function. The First Circuit, however, has held that "sound principles demand that the [SAA] be construed as subject to such discretionary function exception." *Gercey,* 540 F.2d at 539. The *Gercey* court reasoned:

> Were there no such immunity for basic policy making decisions, all administrative and legislative decisions concerning the public interest would be subject to independent judicial review in the not unlikely event that the implementation of these policy judgments were to cause private injuries. That, in our view, would be an intolerable state of affairs,

and we decline, in the absence of an express Congressional directive to the contrary, to construe this waiver of sovereign immunity as providing federal courts with that power.

*Id.* (internal citations omitted); *see also Canadian Transport Co. v. United States,* 663 F.2d 1081 (D.C.Cir.1980)(application of discretionary function exception is necessary in suits under the SAA to maintain a separation of powers between the legislative and judicial branches). Due to a dearth of opinions on the discretionary function under the SAA, the parties and this Court must extrapolate from the well-developed case law on the exception in the context of the FTCA.

*The Discretionary Function Exception*

Like the SAA, the FTCA states that "the United States shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674 (1994). One exception to this broad liability is the discretionary function exception, which reserves the United States' immunity regarding any act based upon a government employee's exercise of discretion. *See* 28 U.S.C. § 2680(a). The exception shields any government act "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*" *Id.* (emphasis added). As a result, the exception prevents courts from making even the most basic of inquiries into the reasonableness of the government's safety or public policy choices, as they would with a private individual under the same circumstances. *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)(certification of aircraft that did not comply with fire pro-

tection regulations); *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953)(exposure of Allied Armed Forces to disastrous effects of ammonium nitrate fertilizer explosion); *Ayer v. United States,* 902 F.2d 1038 (1st Cir.1990)(failure to install handrails and other safety measures for tourists at Air Force Base); *Shuman v. United States,* 765 F.2d 283 (1st Cir.1985) (failure to warn against hazardous working conditions); *Gercey,* 540 F.2d 536 (Coast Guard failure to protect public from vessels decertified as unsafe). Congress intended to shield the policy decisions of the legislature from second-guessing by the judicial branch. *Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Not only do such lawsuits potentially deter the necessary exercise of government discretion, but they also pose a danger to the separation of the judicial and political branches. *Bruneau v. United States,* 150 F.Supp.2d 303, 308 (D.Mass.2001).

Plaintiffs' reliance on *Indian Towing, Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), for the proposition that the discretionary function exception does not apply in the instant case, is misplaced. The Supreme Court, in *Indian Towing,* addressed the issue of whether the Coast Guard should be held liable for the loss of a ship, due to the Coast Guard's failure to maintain a lighthouse in working order. *Id.* Although the Court held the Coast Guard liable for negligently maintaining, inspecting and repairing the light, it specifically stated that the discretionary function was not an issue in the case. *Id.* at 64, 76 S.Ct. 122. Rather, the government argued, unsuccessfully, that the FTCA contained an implied exception for *all* "uniquely government functions." *Id.* Therefore, *Indian Towing* is generally inapplicable to cases that hinge on the discretionary function exception. *See Varig,*

467 U.S at 812, 104 S.Ct. 2755 (distinguishing the holding in *Indian Towing* ).

The Supreme Court addressed the scope of the discretionary function exception in three principal cases. *See Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988); *U.S. v. S.A. Empresa de Viacao Aerea Rio Grandense,* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (exception covers "[n]ot only agencies of government . . . but all employees exercising discretion"). The Court, in *Berkovitz,* created a two-part test to determine the applicability of the exception. First, the government action at issue must involve the element of choice. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954 ("[I]f the employee's conduct cannot appropriately be the product of choice, then there is no discretion in the conduct for the discretionary function to protect."). Second, the decision must be based on the type of judgment Congress intended to protect; i.e. "the *permissible* exercise of *policy* judgment." *Id.* at 539, 108 S.Ct. 1954 (emphasis added); *United States v. Gaubert,* 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (focus of inquiry is not on actor's subjective discretionary intent, "but on the nature of the actions taken and whether they are susceptible to policy analysis"); *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755 (decisions must involve questions of "social, economic and political policy").

■ First, it is axiomatic that the Coast Guard has complete discretion over all search and rescue procedures. Not only does the very premise of emergency rescue logically suggest that decisions be made quickly and responsively, without the constraints of inflexible procedures, Coast Guard regulations and procedural handbooks specifically mandate as much. The

National Search and Rescue Manual states:

> Because of the many variables encountered during SAR operations and the individuality of each SAR case, the guidance provided in this manual must be tempered with sound judgment, having due regard for the individual situation. Nothing in this manual should be construed as relieving SAR personnel of the need for initiative and sound judgment. Therefore, few actions or procedures discussed in this manual are mandatory.

National Search and Rescue Manual, at V. A specific Coast Guard Addendum adds:

> Coast Guard personnel are expected to exercise broad discretion in performing the functions discussed. The Coast Guard retains discretion to deviate from or change this guidance without notice. This document creates no duties, standard of care, or obligations to the public and should not be relied upon as a representation by the Coast Guard as to the manner of proper performance in any particular case.

Coast Guard Addendum, COMDTINST M16130.2B, at 2. The discretionary nature of Coast Guard decision-making is further echoed in its Boat Crew Seamanship Manual:

> The primary purpose of Coast Guard SAR is to save lives at sea. Conducting damage control operations to save property alone should only be done after a complete re-assessment of the situation has been done to ensure the crew will not be subject to undue risk.

Boat Crew Seamanship Manual, at 18–19. Clearly, the exercise of judgment by the Coast Guard on November 2, 1997, was permissible, and therefore satisfies the first prong of the *Berkovitz* test. *See Varig Airlines,* 467 U.S. at 817–19, 104 S.Ct. 2755 (government immune from liability, based on discretionary nature of "spot-check" inspection procedures, as set forth in FAA manuals and handbooks); *compare Berkovitz,* 486 U.S. at 541, 108 S.Ct. 1954 ("Under the regulations, the manufacturer *must* conduct a variety of tests to measure the safety of the product," and "is *required* to submit an application for product license to the DBS")(emphasis added); *Pierre v. United States,* 741 F.Supp. 306, 318 (D.Mass.1990) ("The rules and regulations clearly outline the situations in which lead-based paint *must* be removed.")(emphasis added).

Similarly, the Coast Guard's SAR procedures fulfill the second prong of the *Berkovitz* test. The decision of whether to save the VOYAGER from capsizing, at the expense of putting both the Coast Guardsmen and VOYAGER crew in physical danger, certainly represents "the exercise of policy-based discretion." *Ayer,* 902 F.2d at 1044. Indeed, deposition testimony in this case recounted conversations between Coast Guard officers on the scene, as they weighed the importance of saving human lives against the secondary goal of saving the boat. Policy judgments that concern the safety of individuals must be protected from the "armchair admiralty" of judicial second-guessing. *See id.* at n. 4 (listing cases that have applied the discretionary function exception to policy judgments concerning safety precautions). It is therefore beyond dispute that the implementation of Coast Guard search and rescue procedures is "plainly discretionary activity of the nature and quality protected by § 2680(a)," *Varig Airlines,* 467 U.S. at 797, 104 S.Ct. 2755. Accordingly, defendant United States' motion for summary judgment is allowed.