United States Court of Appeals
For the Eighth Circuit
No. 11-3530

Greg Herden; Roger Herden; Garrett Herden

*Plaintiffs - Appellants*

v.

United States of America

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: May 17, 2012
Filed: August 20, 2012

_____

Before RILEY, Chief Judge, BYE and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff cattle producers appeal the district court's dismissal of their Federal Tort Claims Act (FTCA) complaint. Plaintiffs allege a government employee negligently caused illness and death within their cattle herd by mandating a toxic plant mixture on pasture land enrolled in a conservation program. The district court held the allegation of negligence involved the government employee's exercise of protected discretion and therefore fell within the discretionary-function exception to the FTCA's

waiver of sovereign immunity. Because the discretion exercised in this case was not the type of discretion Congress intended to shield from suit, we reverse.

I.

Greg Herden (Herden) along with his son Garrett Herden and father Roger Herden, owned and operated a cattle farm in Minnesota. Herden enrolled in the Environmental Quality Incentives Program (the Program) through the United States Department of Agriculture's Natural Resource Conservation Service (the Conservation Service). The Program provides financial and technical assistance in exchange for the implementation of conservation measures "to address soil, water, air, and related natural resources concerns, and to encourage enhancements on their lands in an environmentally beneficial and cost-effective manner." 7 C.F.R. § 1466.1 (2004). Pursuant to the Program, Herden agreed to accept a pasture-planting plan to be designed by technical specialists in exchange for the reimbursement of 90% of his costs. Facts pertinent to the issues on appeal include the selection and implementation of the planting plan, the contents of a technical guideline regarding plan selection, and the alleged impact of the plan on Herden's cattle.

Determination of specific planting plans for individual sites is delegated to specialists able to visit sites, evaluate site conditions, and develop plans based upon observed conditions. In Minnesota, William Hunt served as the Conservation Service's State Conservationist. Hunt delegated planting plan decisions to his staff, including State Grazing Specialist Howard Moechnig, whom Hunt assigned to design a plan for Herden's farm.

Federal regulations instruct that Program projects be carried out in accordance with applicable local field office technical guides. 7 C.F.R. § 1466.9(a) (2004). In Minnesota, Moechnig authored the relevant subsection of the applicable guide, the Minnesota Field Office Technical Guide. The subsection, referred to as Code 512,

sets forth standards for pasture and hay planting. Code 512 repeatedly employs permissive language. For example, Code 512 states, "This practice may be applied as part of a resource management system to accomplish one or more of the following goals . . . ." It also frequently employs arguably non-permissive terms such as "will" and "shall." For example, Code 512 states, "Mixtures will have a recommended seeding rate of 50–70 seeds per square foot."

Importantly for our analysis, Code 512 sets forth two tables, Tables 1 and 2. Table 1, captioned "Seeding Rates," contains pasture seeding rates in pounds of pure live seed per acre for several different legumes and grasses. It also lists seeds per pound, which varies dramatically for different plant species because there are large differences in different species' seed sizes. Table 1 provides separate rates for the various plants for use in pure stands and for use in mixtures. Code 512 does not state that the listed rates in Table 1 for each plant type are maximum or minimum rates.

Table 2, captioned, "Mixtures Recommended in Minnesota: Other mixtures may be used," sets forth specified mixtures of seed. Table 1 and Table 2 contain seeding rates for various species that, when converted to seeds per square foot, often exceed the 50–70 seeds per square foot figure quoted above.

Moechnig visited Herden's farm to observe site conditions at three separate pastures enrolled in the program. The present dispute involves only one of the three pastures. The Plaintiffs do not allege any negligence related to the other two pastures.

At the pasture involved in this case, Moechnig observed saturated soil conditions. According to a declaration submitted to the district court, Moechnig selected a high seeding rate to ensure establishment of a pasture in difficult growing conditions. In the declaration, consisting of a series of numbered paragraphs, he described Code 512 as well as several different goals and factors he considered when selecting the seeding mixture and rate. In particular, he stressed that he chose a high

-3-

seeding rate to ensure establishment of a pasture under difficult site conditions because a failed planting would be a waste of Program funds and therefore a poor investment of public funds. The seeding mixture Moechnig selected included four pounds per acre of Timothy (a grass), three pounds per acre of Garrison Creeping Foxtail (a grass), and six pounds per acre of Alsike Clover (a legume) (collectively, the "Recommended Seeding Mixture"). Six pounds per acre Alsike Clover was three times the amount stated in Tables 1 and 2 for planting Alsike Clover as part of a seed mixture. The overall count of seeds per square foot for the Recommended Seeding Mixture was far in excess of the 50–70 seeds per square foot figure quoted above.

According to Herden, Herden complained to Moechnig that the Recommended Seeding Mixture called for too much Alsike Clover and that Alsike Clover can be toxic to cattle. Moechnig stated in his declaration that he did not recall Herden complaining about possible Alsike Clover toxicity, but he did recall Herden asking for permission to plant Alfalfa instead of the seeding mixture. Moechnig denied permission, and Herden's pasture was planted with the Recommended Seeding Mixture.

Herden subsequently allowed his cattle to graze the pasture. In addition, he harvested hay from the pasture, stored the hay, and fed the hay to his herd. Eventually, his herd experienced illnesses, birth defects, and deaths. According to Herden, the planting of the Recommended Seed Mixture with its high concentration of Alsike Clover was the cause of illness and death in his herd and led to the loss of a multi-generational farming business. The Conservation Service contests Herden's allegations of causation, arguing that mold in improperly stored hay caused the illness and also arguing that technical literature as well as autopsies of Herden's cattle disprove Herden's claims.

Herden brought the present suit pursuant to the FTCA alleging negligence in the selection of the Recommended Seeding Mixture. The government moved for

-4-

dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) based on a lack of subject matter jurisdiction. The government argued that Moechnig exercised properly delegated discretion and that Herden's suit was barred by the discretionary function exception to the FTCA's waiver of sovereign immunity. The district court held that Moechnig did, in fact, exercise properly delegated discretion. The district court also held that this discretion involved the balancing of policy goals and considerations, including the allocation of Program funds, and that, as such, it was the type of discretion Congress intended to exempt from suit. Herden appeals.

## II.

The FTCA contains an express waiver of sovereign immunity allowing damage suits against the United States based upon state-law tort actions. 28 U.S.C. § 1346(b)(1). An exception to this waiver of immunity, referred to as the discretionary function exception, "provides that no liability shall lie for '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.'" Berkovitz by Berkovitz v. United States, 486 U.S. 531, 535 (1988) (quoting 28 U.S.C. § 2680(a)). This exception applies where (1) the federal employee's action "involves an element of judgment or choice," id. at 536, and (2) the requisite judgment or choice is the type of government action Congress intended to protect from the "second–guessing" attendant to tort suits. Demery v. U.S. Dep't of Interior, 357 F.3d 830, 833 (8th Cir. 2004) ("'The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" (quoting Berkovitz, 486 U.S. at 536–37)). We have characterized the second step of this inquiry as identifying government actions that are "susceptible to policy analysis," id., "whether or not defendant in fact engaged in conscious policy-balancing." C.R.S. by D.B.S. v. United States, 11 F.3d 791, 801 (8th Cir. 1993).

"We review de novo a district court's grant of a motion to dismiss under the discretionary function exception to the FTCA." Dykstra v. U.S. Bureau of Prisons, 140 F.3d 791, 795 (8th Cir. 1998)  Although federal courts are not constrained to consider only the pleadings when assessing questions of subject matter jurisdiction, and although we review Rule 12(b)(1) factual determinations for clear error,[1] disputed facts will rarely factor into a court's analysis of the discretionary function exception. This is because we do not ask how the particular government actor actually exercised or failed to exercise discretion; we ask only if the challenged action permitted the exercise of discretion and whether it was the type of governmental action that is susceptible to policy analysis. 28 U.S.C. § 2680(a) (stating that the United States may not be sued based upon the "exercise or performance or the failure to exercise or perform a discretionary function . . . , *whether or not the discretion involved be abused*") (emphasis added); Demery, 357 F.3d at 833 ("The judgment or decision need only be susceptible to policy analysis, regardless of whether social, economic, or political policy was ever actually taken into account, for the exception to be

_____

[1]In  Osborn v. United States, 918 F.2d 724, 730 (8th Cir. 1990), we discussed at some length the power of the courts to address factual questions when addressing the issue of subject matter jurisdiction:

> [W]hen the district court's decision to dismiss for lack of subject matter jurisdiction is based on the complaint alone, or on the complaint supplemented by undisputed facts evidenced in the record, the appellate court's review is limited to determining whether the district court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed. If the court relied, however, on its own determination of disputed factual issues, the appellate court must then review those findings under the clearly erroneous standard.

Id. (internal citations and quotation marks omitted).

-6-

triggered."); C.R.S., 11 F.3d at 798 ("Defendant could have considered a wide range of policy factors in making its decision; whether or not it actually did so is immaterial . . . .").

Typically, any assessment of how the government actor actually exercised his or her discretion will speak to the substantive questions of whether there was negligence or some other violation of a state-law duty. Such questions simply are not before the court at this preliminary stage and cannot be considered. In fact, we have emphasized this distinction by expressly disavowing any approval of challenged governmental actions even when finding them protected by the exception. See C.R.S., 11 F.3d at 802 ("By so holding, we in no way endorse the decisions defendant made. We find only that they are the type of decisions that Congress intended to immunize from suit."). The only questions before our court, then, involve the proper articulation of the governmental action under scrutiny and determination of whether the action involved discretion of a type Congress intended to shield from suit by the discretionary function exception.

Here, the government action at issue was Moechnig's selection of the Recommended Seeding Mixture. Regarding the first step of our analysis, we conclude that this action was "the product of 'judgment or choice,'" Dykstra, 140 F.3d at 795 (quoting United States v. Gaubert, 499 U.S. 315, 322 (1991)), because no "statute, regulation, or policy mandate[d] a specific course of action." Id. Although a governing regulation directs Program planners to follow state technical guides, 7 C.F.R. § 1466.9(a) (2004), the relevant technical guide in this instance is just that—a guide allowing for discretion rather than a menu of mandatory seeding plans.

The parties agree the relevant technical guide in this case is Code 512. The portion of Code 512 that addresses seed mixture selection employs permissive language couched in terms of recommendations; firm mandates are absent. Code 512

-7-

Table 2 is even entitled "Mixtures Recommended in Minnesota: *Other mixtures may be used*." (Emphasis added). Further, although Plaintiffs argue Code 512 strictly mandates seed application rates of between 50–70 seeds per square foot, a simple conversion of figures from the tables that are presented in pounds of seed per acre show several "Seeding Rates" and "Mixtures Recommended in Minnesota" that exceed the purported maximum of 70 seeds per square foot recited by Plaintiffs. This internal inconsistency, the predominant use of permissive language, and the express statement that other mixtures may be used show Code 512 contains no strict mandates for seed mixture selection. Accordingly, we conclude Moechnig's selection of a seeding plan was discretionary.

The harder question arises in the second step of our analysis: whether this discretion was of the kind Congress intended to shield from suit—whether it was susceptible to policy, economic, and social analysis. "'When established governmental policy . . . allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion.' The plaintiff must rebut this presumption. Otherwise, the court will presume the decision was based on public policy considerations." <u>Demery</u>, 357 F.3d at 833 (quoting <u>United States v. Gaubert</u>, 499 U.S. 315, 324 (1991)) (other internal citations and marks omitted).

We believe Plaintiffs have overcome the presumption in this case. Moechnig's role was to observe site conditions and apply his technical expertise to design a seed mixture likely to thrive under those conditions and likely to provide benefits in the form of forage for cattle, habitat for wildlife, protection for surface and groundwater, and protection for soil and air quality. Because he was to design a mixture to meet these goals, and because Program funds would be expended to execute his plan, cost effectiveness was also a relevant consideration. Technical experts charged with the duty of designing such a plan, however, are given the policy goals to consider; they are not instructed to identify or consider some different possible set of goals. Cost in

this setting is a consideration for a person like Moechnig only to the extent that a failed planting would result in expenses without satisfaction of the program goals. Other persons determine larger issues of cost: whether particular landowners are eligible for the program, what goals should be set for the plan designers, and how costs should be shared with landowners.

Several aspects of this process stand out when drawing comparisons to other FTCA discretionary-function cases. First, the consideration of cost arguably can, but need not, be characterized as an economic analysis of the type Congress intended to protect. C.R.S., 11 F.3d at 802 ("[C]ost alone is not always sufficient to protect discretionary government conduct."). Second, in a broad sense, "protecting the environment and aquatic habitats . . . are obvious issues of policy." Demery, 357 F.3d at 833. Moechnig, as already stated, however, was not required to decide, as a policy matter, whether to champion environmental protection in general or on Plaintiffs' land specifically. He instead was simply required to apply his scientific knowledge to balance pre-defined interests as best he could given the site conditions. In this regard, we believe it is highly material that Moechnig's decision rested largely on technical considerations. As with cost considerations, however, our analysis does not rest on any type of firmly established, single-factor litmus test such as a technical/policy divide. Compare Lather v. Beadle Cnty., 879 F.2d 365, 368 (8th Cir. 1989) (finding a government medical professional's conduct not protected and stating, "Where only professional, nongovernmental discretion is at issue, the discretionary function exception does not apply.") with C.R.S., 11 F.3d at 797 ("[T]here is no bright line rule removing 'professional' or 'technical' judgments, whatever these may be, from the scope of the exception. The inquiry does not depend on labels . . . ."). Finally, even though a technical expert such as Moechnig makes decisions on an individualized and site-specific basis (rather than on a large-scale and program-wide basis) we have not recognized the scale of impact as a stand-alone test for application of the discretionary function exception. See, e.g., Riley v. United States, 486 F.3d 1030, 1033 (8th Cir. 2007) (finding protected conduct in the decision to place mailboxes curbside near an

intersection rather than to place the boxes elsewhere or deliver mail to a particular set of individual houses).

The factor that most strongly suggests a possible need for policy judgment in the exercise of discretion in this setting is the need to consider costs. Here, however, we believe any need to consider costs is not a sufficiently important aspect of seed plan selection to permit characterization of the decision as a protected economic analysis. Regarding policy analysis, a technical expert like Moechnig designing a seeding plan does not weigh and balance policy interests in a manner Congress likely sought to protect. Taking as a given that the provision of forage, the creation of wildlife habitat, and the protection of water, soil, and air quality are all goals to be achieved, any balancing of these goals against site conditions is merely the delegation of the final technical step in a process that has already hammered out the policy and societal issues embedded in the Program.

In this regard, we find an analogy to military or veteran's administration physicians compelling. Such physicians necessarily possess discretion bounded by the range of choices permitted under governing standards of professional care. In a very real sense, every decision they make with regard to each patient is at least susceptible to a cost benefit analysis—the government is paying for the physician's time and the services and facilities being utilized. As with any physician, these government employees should not—and hopefully do not—order wildly unnecessary tests or procedures (although there undoubtedly exist debatable cost-benefit determinations with almost every patient). Rather, the physicians exercise their technical expertise in making practical decisions as to individual courses of treatment for their patients.

Resting behind such technical and medical decisions, however, are larger issues that more clearly constitute policy choices. Such policy choices include determining which veterans qualify for government-funded services, how heavily a facility should

be staffed, and how much money should be spent to ensure a chosen level of timeliness in the provision of services.

The discretionary function exception does not protect such physicians from tort actions. See, e.g., Lather, 879 F.2d at 368 (refusing to apply the discretionary function exception and stating, "It is evident that Lather has alleged an improper medical, rather than policy, decision. We therefore conclude that . . . the discretionary function exception . . . cannot be applied at this point."). We find this analogy compelling because it represents a relationship that necessarily plays out in many areas of government programs. This relationship involves, on the one hand, a broader program with obvious policy, economic, and societal issues inherent in decisions not subject to attack in a proposed suit. On the other hand, it involves a challenge to the actions of an individual decisionmaker vested with discretion to apply some form of specialized knowledge to deliver upon the program's stated goals with reference to individual participants. In the functioning of our modern government, the types of functions delegated for consideration by federal employees often and necessarily vest an employee with some degree of specialized discretion and inherent spending authority in the final stages of execution. In assessing the applicability of the discretionary function exception, however, the courts must avoid undue reliance on labels and strive to divine, in each varied circumstance, if the discretion was of the type Congress likely intended to shield from suit. C.R.S., 11 F.3d at 802 ("The proper focus, rather, is on whether a decision is 'of the nature and quality that Congress intended to shield from tort liability.'" (quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813 (1984))). If the physician in Lather falls outside the protection of the discretionary function exception, we find little in the way of meaningful distinctions that justify treating an actor like Moechnig any differently.

That having been said, we do not mean to suggest reliance upon a scale-based (individual vs. program-wide) distinction as a dispositive test. In many of our cases,

we have found the exception applicable where a discrete and site-specific act of warning or failing to warn, or maintaining or failing to maintain a facility, led to a tort action. See, e.g., Demery, 357 F.3d at 834 (finding the exception applicable to the decision of a government employee to provide a warning regarding open water in winter and the decision of what form that warning should take); E. Ritter & Co. v. Dep't of the Army, Corps of Eng'rs, 874 F.2d 1236, 1241 (8th Cir. 1989) (holding that the discretionary function exception precluded suit based upon the design and construction of a flood control ditch but that it did not preclude suit based upon the non-policy-judgment-related failure to maintain the ditch). In those cases, however, we typically have found an absence of discretion or an underlying decision where the balancing of policy issues such as safety concerns and project cost appeared to be substantial and important factors. In the case of the government physician and in the present case, policy-based and economic-based factors may not be wholly lacking, but their importance to the challenged decision is tenuous at best—in the case of a government physician, determining what medical treatment is best for a patient, and in the case of a government pastureland specialist, what plants are likely to thrive, improve the soil, and feed the cattle at a particular site.

In summary, we do not purport to be able to identify a clear line or easily articulated test separating protected from unprotected conduct in all cases. "The issue of whether conduct is truly discretionary and whether there are real and competing policy considerations implicated is what separates" protected from unprotected conduct. C.R.S., 11 F.3d at 802. Here such policy considerations were not at issue in any meaningful way.

We reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

BYE, Circuit Judge, dissenting.

The critical question in this case is whether Moechnig's decisions in formulating a seeding mixture for the Herdens' pasture were "susceptible to policy analysis." United States v. Gaubert, 499 U.S. 315, 325 (1991). Because I believe they were, I respectfully dissent.

I agree with the majority's statement that Moechnig's role was to "design a seed mixture likely to thrive under . . . conditions [unique to a particular pasture, which would] provide benefits in the form of forage for cattle, habitat for wildlife, protection for surface and groundwater, and protection for soil and air quality." Ante at 8. Further, I agree that "cost effectiveness was also a relevant consideration[,]" and that technical experts such as Moechnig are "given . . . policy goals to consider[.]" Id. I disagree, however, with the majority's claim that Moechnig "was not required to decide, as a policy mater, whether to champion environmental protection in general or on Plaintiffs' land specifically[,]" and that instead he "was simply required to apply his scientific knowledge to balance pre-defined interests as best he could given the site conditions." Id. at 9.

Specifically, I disagree with the majority's characterization of Moechnig's decision-making process as a simple application of his scientific knowledge. Instead, as the majority concedes, Moechnig was attempting to balance pre-defined interests—cattle pasture production, with environmental concerns, with a return on taxpayers' investment. And while the majority admits the Program's designers had to consider these "policy and societal issues" when they originally designed the program, Id. at 10, it declines to acknowledge that a grazing specialist such as Moechnig must weigh those same policy considerations when he makes site-specific recommendations. I fail to see how Moechnig's decision in weighing those pre-determined considerations is any less a policy-based choice.

Simply because Moechnig had pre-defined interests to balance does not mean his decision was not policy-based, particularly when those interests compete with each other. The majority contends that any policy considerations—specifically cost—were not at issue in any meaningful way. I disagree.

First, I do not believe cost was the only competing policy interest Moechnig had to consider. The majority concludes that cost is "[t]he factor that most strongly suggests a possible need for policy judgment in the exercise of discretion[.]" Id. at 10. However, I believe we must also recognize that decisions regarding environmental protection, and the methods employed to achieve the best, and most acceptable results to all parties involved, are firmly rooted in policy. See Demery v. U.S. Dep't. of Interior, 357 F.3d 830, 833 (8th Cir. 2004) (stating "decision[s to] . . . protect[] the environment and aquatic habitats [involve] . . . obvious issues of policy").

Second, by not properly acknowledging that decisions concerning environmental protection are firmly rooted in policy choices, the majority fails to recognize that developing cattle pasture and protecting the environment are often competing interests. If the interests were not competing, there would be no need for the EQIP Program. Rather, the Program exists, and the government provides financial and technical assistance to individuals such as the Herdens, in order to incentivize private landowners to emphasize conservation measures. To be sure, environmental protection and pasture production goals can be compatible; if they were completely incompatible, no rational rancher would sign up for the program. For example, in many cases a grazing specialist should be able to choose a particular grass or legume mixture that can provide good forage for cattle, while meeting environmental goals, including wildlife habitat creation and erosion prevention.

On occasion, however, those goals compete with each other. In such a case, the specialist implementing EQIP on the ground—in this case Moechnig—must have the discretion to choose environmental protection over cattle production in order for the

-14-

program to be worth the government's significant investments. For example, what should happen if a grazing specialist recognizes a particular pasture to be unusually susceptible to erosion because of exceptionally wet conditions? Under such conditions, the specialist might choose a species more tailored to environmental concerns over another species with higher nutritional content for cattle—a species that could nevertheless survive, but had less potential to stabilize ground conditions. In that case, because the environmental and ranching priorities would be competing, the specialist should—and in this case did—have the discretion to weigh the competing policy goals in formulating a plan best tailored to that particular location, which will meet the needs of all parties on some level. I see this as more than a simple application of technical expertise.

The majority analogizes to Lather v. Beadle County, 879 F.2d 365 (8th Cir. 1989), by comparing Moechnig's professional judgment in developing a seeding plan with that of a psychologist's exercise of medical judgment. But in doing so, the majority only considers the issue of cost as a policy consideration. I recognize virtually any decision involves a cost-benefit analysis on some level. I further agree that cost analysis is not (or should not be) a meaningful part of the psychologist's decision-making process when she applies her specialized knowledge in treating a patient. See also Fang v. United States, 140 F.3d 1238, 1242-44 (9th Cir. 1998) (finding an emergency medical technician's actions in assisting a victim did not involve a need to balance competing policy concerns; rather, the goal was singular—to aptly assist accident victims). And, if in this case the only policy consideration competing with providing cattle forage was Moechnig's desire to choose a high enough seed density to ensure proper germination, thus resulting in a good return on taxpayer's investment, then I may agree with the majority's ultimate decision.

Yet as I stated above, I do not believe cost was the only policy choice Moechnig faced. Instead, I believe Moechnig's job required him to balance protecting the

-15-

environment with providing nutritious cattle forage, while reducing taxpayer cost. This job undoubtedly required Moechnig to draw on his technical expertise in order to determine what seed mixture would thrive under various environmental conditions. But, the fact a specialist needs a technical background in order to develop an appropriate seeding plan, does not mean his decision was not also susceptible to policy analysis. I believe the decisions Moechnig made when he developed the Herdens' seeding plan were capable of being based in policy considerations, and therefore decisions Congress meant to insulate from suit. See Chantal v. United States, 104 F.3d 207, 212 (8th Cir. 1997) ("It is well established that a decision which requires the weighing of competing interests is 'susceptible to policy analysis' and typifies the kind of governmental decisions which Congress intended to shield from judicial second-guessing.") (quoting Gaubert, 499 U.S. at 325).

Accordingly, I would conclude the discretionary function of the FTCA applies in this case, and affirm the district court.

_____